**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Angel ARGUETA ANARIBA,

Plaintiff,

-against-

UNITED STATES OF AMERICA;
"FNU" DALEY, in his individual
capacity; "FNU" FREEMAN, in his
individual capacity; "FNU" DESEO, in
his individual capacity; and "FNU"
HALL, in his individual capacity,

Defendants.

**COMPLAINT FOR DAMAGES**

---

**COMPLAINT**

---

### INTRODUCTION

1.     Plaintiff Angel Argueta Anariba ("Mr. Argueta Anariba") is a 46-year-old citizen and national of Honduras who has resided in the United States since 1998. During his over seven years in civil detention, Mr. Argueta Anariba was subjected to inhumane conditions of confinement and egregious mistreatment by ICE and its contractors and was transferred a total of seventeen (17) times across the United States.

2.     Mr. Argueta Anariba spoke out about the conditions of his detention as a vehement self-advocate. With the goal of exposing Defendants' misconduct and securing proper medical treatment, he continuously filed grievances and administrative complaints and contacted journalists and advocates. He also engaged in multiple hunger strikes to demand access to his medically prescribed diet.  In response, ICE and its contractors abused and retaliated against Mr. Argueta Anariba.

3.      While detained at the Adams County Correctional Center ("Adams County") in Natchez, Mississippi, from October 29, 2020, through December 11, 2020, Plaintiff engaged in a hunger strike to protest his medical neglect. ICE and its contractors swiftly retaliated against Plaintiff by punishing him with solitary confinement for a period of 43 continuous days. During this period, Plaintiff was repeatedly denied access to water, subjected to inhumane conditions, and continuously tormented with severe verbal harassment and threats. An ICE officer instructed Plaintiff that "the only way you leave this facility is if you die here."

4.      When detained at the Pine Prairie ICE Processing Center ("Pine Prairie") in Pine Prairie, Louisiana, from December 16, 2020, through April 6, 2022, Plaintiff continued to advocate for access to his prescribed medical diet and participated in multiple hunger strikes. In response, officers at Pine Prairie acted unlawfully. On March 17, 2022, Plaintiff was violently attacked by officers. During this unprovoked attack, four officers handcuffed Plaintiff, violently slammed his head to the ground, twisted his cuffed arms backwards over his head, and dragged him by his cuffed arms into a solitary confinement cell, injuring a ligament in his right shoulder. He was then held in solitary confinement for 16 continuous days. This assault resulted in a significant long-term injury that continues to cause Plaintiff immense pain and suffering and has resulted in Plaintiff's long-term disability, preventing him working and limiting his daily activities.

5.      Plaintiff brings claims against the United States under the Federal Tort Claims Act ("FTCA") because individual officers of Immigration and Customs Enforcement ("ICE") undertook severe and retaliatory abuse of the Plaintiff while he was in their custody. Plaintiff seeks damages under this claim.

6. Plaintiff also brings state law tort claims against Defendants Daley, Freeman, Deseo, and Hall (collectively, the "Individual GEO Group, Inc. Officers") for their unlawful battery and assault of Plaintiff. Plaintiff seeks damages under this claim.

## JURISDICTION AND VENUE

7. This action is brought under the Federal Tort Claims Act ("FTCA").

8. The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1346(a)(3). This Court also has jurisdiction in this case, which arises under federal law, pursuant to 28 U.S.C. § 1346(b) because this is a civil action against the United States for personal injury caused by the negligent and wrongful acts and omissions of government employees.

9. This Court has subject matter jurisdiction over Claims VI and VII pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy giving rise to all other claims.

10. On October 27, 2022, Plaintiff submitted an administrative claim to ICE pursuant to 28 U.S.C. § 2675(a). On January 26, 2024, ICE denied Plaintiff's administrative claim, fulfilling the requisite for the filing of this action under 28 U.S.C. § 2401(b). Accordingly, Plaintiff has exhausted all potential administrative remedies.

11. Venue is proper under 28 U.S.C. § 1402(a)(1) because Plaintiff resides in the District of Columbia.

## PARTIES

### *Plaintiff*

12. Mr. Argueta Anariba is a citizen and national of Honduras who entered the United States in 1998. He resides in the District of Columbia. ICE detained Mr. Argueta Anariba in civil immigration detention for a total of seven years, from December 2014 until April 2022.

***Defendants***

13.     Defendant United States of America is an appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b) 2671, *et seq.*

14.     Defendant "FNU" Daley was at all relevant times a Geo Group, Inc. officer at Pine Prairie.

15.     Defendant "FNU" Freeman was at all relevant times a Geo Group, Inc. officer at Pine Prairie.

16.     Defendant "FNU" Deseo was at all relevant times a Geo Group, Inc. officer at Pine Prairie.

17.     Defendant "FNU" Hall was at all relevant times a Geo Group, Inc. officer at Pine Prairie.

## STATEMENT OF FACTS

18.     Mr. Argueta Anariba is a citizen and national of Honduras and was born in February 1978. At the age of 20, in November 1998, Mr. Argueta Anariba fled Honduras in the aftermath of Hurricane Mitch, a climate crisis that destroyed his home and livelihood. He traveled to the United States and resided in Washington, D.C., where he lived and worked as a member of this community for over fifteen years. He raised two United States citizen children and developed expertise through his career in construction and carpentry.

19.     In December 2014, ICE placed Mr. Argueta Anariba in removal proceedings and he was initially taken into custody and detained at the Otisville Federal Correctional Institution in

New York.[1] As part of a series of frequent transfers,[2] ICE detained Mr. Argueta Anariba at Adams County in Mississippi during two separate time periods: from September 19, 2019, through November 7, 2019, and from October 29, 2020, through December 11, 2020. ICE detained Mr. Argueta Anariba at Pine Prairie in Louisiana from December 16, 2020, through April 6, 2022, the date of his release from custody.

20.     ICE operates Adams County under a contract it holds with CoreCivic, a private prison company. ICE operates Pine Prairie under a contract it holds with another private prison company, the Geo Group, Inc. Both contracts mandate compliance with ICE's 2011 Performance-Based National Detention Standards ("PBNDS"), as revised in December 2016.[3] The PBNDS are binding and enforceable against ICE.

_____

[1] ICE detained Mr. Argueta Anariba in December 2014 after he was granted early release from criminal custody. In September 2007, Mr. Argueta Anariba was arrested and convicted of aggravated assault under D.C. Code § 22-404.01 and sentenced to 96 months of incarceration. While incarcerated, Mr. Argueta was a model of rehabilitation. He was released early in December 2014, around two years before the end of his sentence, as a result of his credit for good behavior while incarcerated.

[2] Initially, in December 2014, Mr. Argueta Anariba was detained for approximately two weeks at Otisville Federal Correctional Institution in New York. He was then transferred to Orange County Correctional Facility in New York where he remained until August 2015. In August 2015, he was transferred to LaSalle Detention Facility ("LaSalle") in Louisiana for less than one month. Mr. Argueta Anariba was then transferred to Etowah County Detention Center ("Etowah") in Alabama. He was transferred back and forth, from LaSalle to Etowah, several times before being moved to Hudson County Correctional Center ("Hudson") in New Jersey in 2016. Mr. Argueta Anariba was then returned to LaSalle, sent back and forth between LaSalle and Etowah again, until he was transferred back to Hudson in October 2018. He was transferred to Essex County Correctional Center in New Jersey where he was held until September 2019. From September 2019 through November 2019, Mr. Argueta Anariba was detained at Adams County Correctional Center ("Adams County") in Mississippi. He was then transferred to Catahoula Correctional Center in Louisiana. He was returned to Adams County from October 2020 through December 2020, when he was transferred to Joe Corley Detention Center in Texas. In December 2020, he was transferred to Pine Prairie ICE Processing Center in Louisiana, where he was detained until his release in April 2022.

[3] *See* ICE Performance-Based National Detention Standards 2011 (Revised 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

21.     The PBNDS establishes mandatory, non-discretionary policies and practices related to the treatment of hunger strikers, the use of force, the use of solitary confinement, retaliation, transfers, and other practices that facilities and operators of facilities must follow. ICE is responsible for ensuring that the requirements of the PBNDS are followed at immigration detention facilities by ICE employees and by ICE contractors.

22.     Both Adams County and Pine Prairie are under the jurisdiction of the New Orleans ICE Field Office. In recent years, detained people, their advocates, politicians, and journalists have raised concerns about the consistent inadequacy of medical and mental health care, the inhumane living conditions, inedible and insufficient food, and the frequent instances of severe abuse, violence, and retaliation that are systemic within ICE jails under the New Orleans ICE Field Office, including Adams County and Pine Prairie.[4]

23.     Oversight entities, including the U.S. Department of Homeland Security Office of Civil Rights and Civil Liberties ("CRCL"), the Office of the Inspector General ("OIG"), and the ICE Office of the Immigration Detention Ombudsman ("OIDO") have documented abuses at Adams County and Pine Prairie.[5]

_____

[4] *See e.g.,* U.S. Department of Homeland Security, Office of Civil Rights and Civil Liberties, Complaint, RE: Call for Immediate Investigation into Immigration and Customs Enforcement Officers' Use of Punitive Solitary Confinement as a Response to the COVID-19 Pandemic and Other Public Health Crises (June 21, 2021), https://rfkhumanrights.org/assets/documents/RFK-Human-Rights-Pine-Prairie-DHS-Complaint.pdf (documenting the frequent weaponization of solitary confinement against protestors and hunger strikers at Pine Prairie, among other forms of abuse and mistreatment); U.S. Department of Homeland Security, Office of Civil Rights and Civil Liberties, Complaint, RE: Unchecked Human Rights and Civil Rights Abuses Systemic within the New Orleans ICE Field Office Area of Responsibility (December 16, 2021), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/61bb36c9cc4c282092cbd145/1639659209877/DHS+NOLA+ICE+Investigation+Follow-Up+Letter+%281%29.pdf.
[5] *See e.g.,* Office of Inspector General, "Violations of ICE Detention Standards at Adams County Correctional Center," OIG-21-46 (July 14, 2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-07/OIG-21-46-Jul21.pdf (OIG inspection

24.     On January 31, 2020, CRCL sent a memorandum to ICE's Acting Director and the Executive Principal Legal Advisor regarding numerous complaints that CRCL had received about abuses at Pine Prairie Detention Center.[6] The complaints involved allegations related to violations of due process rights, national origin discrimination, prolonged segregation, physical, verbal and mental abuse, denial of legal access, and quarantine and exposure to airborne illnesses resulting in denial of recreation. The memorandum informed ICE that CRCL would be conducting an onsite investigation of Pine Prairie.

25.     On February 18-20, 2020, CRCL conducted its onsite investigation of Pine Prairie, using four independent subject matter experts: a medical consultant, mental health consultant, environmental health and safety consultant, and a penologist.[7] Based on interviews with detained people and staff, document reviews, and onsite observations, the experts identified numerous deficiencies at Pine Prairie, including in medical and mental health care. On August 12, 2020, after completing its investigation of Pine Prairie, CRCL issued a memorandum to the Executive Associate Director of ICE Enforcement and Removal Operations. The memorandum addresses deficiencies in areas including, but not limited to, sick calls, medications, confidentiality of

_____

of Adams County finding deficiencies in grievances, segregation, and staff-detainee communications).

[6] Memorandum from Cameron P. Quinn, Officer, Office for Civil Rights and Civil Liberties, to Matthew T. Albence, Acting Director, U.S. Immigration and Customs Enforcement, and Michael P. Davis, Executive Deputy Principal Legal Advisor, Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement, Pine Prairie Detention Center (January 21, 2020), https://www.dhs.gov/sites/default/files/publications/pine-prairie-detention-center-01-31-20.pdf.

[7] Memorandum to Enrique M. Lucero, Executive Associate Director, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, from Peter E. Mina, Deputy Officer for Programs and Compliance, Office for Civil Rights and Civil Liberties, and Dana Salvano-Dunn, Director, Compliance Branch, Office for Civil Rights and Civil Liberties, Pine Prairie Detention Center (August 12, 2020), https://www.dhs.gov/sites/default/files/2022-06/2020.08.12%20CRCL%20Rec%20Memo%20to%20ICE%20–%20Pine%20Prairie_Redacted_508.pdf

medical records, specialty care, calculated use of force, suicide prevention, the disciplinary process, and environmental health and safety.

26. On September 20, 2023, the ICE Office of the Immigration Detention Ombudsman ("OIDO") issued a report finding 17 violations of the PBNDS at Pine Prairie.[8] Those violations included "documentation of medical clearances for detainees in segregation;" "documentation of medication doses;" "medical credentialing;" "timely response to detainee communications;" and "detainee privacy."

27. Plaintiff experienced this neglect and abuse firsthand during his lengthy detention at both Adams County and Pine Prairie.

28. Mr. Argueta Anariba made several attempts to alert the public to the dire conditions at Adams County and Pine Prairie. Throughout his seven-year detention by ICE, Mr. Argueta Anariba experienced continuous medical neglect related to his multiple medical conditions, including a hernia, his chronic asthma, and food allergies. Mr. Argueta Anariba is allergic to several food items including tomatoes, peppers, spices, citrus, and lactose. As a result of these allergies, he is prescribed a specific medical diet. Despite the fact that ICE was aware of this prescribed medical diet beginning in 2016, ICE and its contractors consistently denied Mr. Argueta Anariba access to this diet.

29. During his detention, he filed grievances; submitted complaints to ICE and DHS; litigated a habeas petition; and spoke with advocates and journalists about the conditions he faced in ICE custody and his inhumane treatment.[9]

_____

[8] Office of the Immigr. Detention Ombudsman, OIDO Inspection: Pine Prairie ICE Processing Center (Sept. 20, 2023), https://www.dhs.gov/sites/default/files/2024-01/23_0920_OIDO_Final-Inspection-Report-Pine-Prairie-ICE-Processing-Center_0.pdf
[9] Alleen Brown, "Migrants Fleeing Hurricanes and Drought Face New Climate Disasters in ICE Detention," *The Intercept* (March 31, 2022), https://inquest.org/no-end-in-sight/; Angel

**The Defendants Retaliate Against Plaintiff By Punishing Him with
Solitary Confinement At Adams County**

30.     Mr. Argueta Anariba was detained at Adams County in Mississippi from October 29, 2020, through December 11, 2020 where he was held in a solitary confinement cell for 43 continuous days.

31.     When Mr. Argueta Anariba was initially transferred to Adams County, in accordance with the ICE Pandemic Response Requirements ("PRR"), Version 5.0, in effect at the time, he was placed in medical isolation under quarantine protocols.[10] However, as the PRR, which are binding and mandatory,[11] make clear, "when detainees have to be housed in the spaces used for administrative or disciplinary segregation, facilities must ensure that medical isolation is operationally distinct from administrative or disciplinary segregation, or any punitive form of housing. Detainees in medical isolation must be provided access to books, television, recreation

_____

Argueta, "No End In Sight: I finished my sentence more than seven years ago. But I'm still trapped in an immigration prison, where the punishment endures," *Inquest* (April 2, 2022), https://inquest.org/no-end-in-sight/.

[10] U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Covid-19 Pandemic Response Requirements (Version 5.0, October 27, 2020) at P. 26, available at: https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf ("Transfers of ICE detainees and non-ICE detained populations to and from other jurisdictions and facilities are discontinued unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding. Detainee transfers for any other reason require justification and pre-approval from the local ERO Field Office Director. Detainee transfers must have cleared quarantine protocols and be cleared by ICE Health Services Corps.").

[11] *Id.* at 5 ("On April 20, 2020, the U.S. District Court for the Central District of California issued a preliminary injunction requiring that ICE 'issue a performance standard or a supplement to their Pandemic Response Requirements … defining the minimum acceptable detention conditions for detainees with risk factors.' *Fraihat v. ICE*, --- F.Supp.3d ---, 2020 WL 1932570, *29 (C.D. Cal. Apr. 20, 2020). The ERO PRR has accordingly been updated to define the 'minimum acceptable detention conditions for detainees with risk factors'...The ERO PRR builds upon previously issued guidance and sets forth specific mandatory requirements to be adopted by all detention facilities, as well as recommended best practices, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis.").

and to telephones to the fullest extent possible." The PRR explicitly mandate that "extended lockdowns must not be used as a means of COVID-19 prevention."

32.     While in medical isolation at Adams County, Mr. Argueta Anariba was subjected to medical neglect and denied access to his prescribed medical diet. In response, he made several verbal complaints to officers and other personnel at Adams County. He also submitted written grievances to medical personnel, ICE, and the Warden of the jail. However, the medical personnel, ICE, and its contractors declined to provide Mr. Argueta Anariba with his prescribed medical diet.

33.     After 12 days without access to his prescribed medical diet, on November 9, 2020, Mr. Argueta Anariba began a hunger strike to protest this medical neglect and the conditions of his confinement. In response, ICE and its contractors punished Mr. Argueta Anariba with solitary confinement. They impermissibly extended his confinement in the same cell that he was held in pursuant to medical isolation and impermissibly applied punitive conditions in retaliation for his participation in a hunger strike.

34.     He participated in this hunger strike for 34 days until he was transferred from Adams County on December 11, 2020.

35.     During this 34 day time-period, Mr. Argueta Anariba was only provided with access to a shower once or twice a week. He was held in the solitary confinement cell for 24 hours a day and was denied access to recreational time and recreational materials, including the phone and television. ICE and its contractors cut the water supply to his cell and denied Mr. Argueta Anariba access to drinking water from the toilet-sink in his cell. As a result, Mr. Argueta Anariba's access to drinking water was left to the sole discretion of individual officers, who often taunted him and refused to provide him with sufficient water. ICE and its contractors allowed the sewage in Mr. Argueta Anariba's cell to overflow and refused to clean his cell for eight days. ICE and its

contractors subjected Mr. Argueta Anariba to daily verbal harassment and threats. An ICE officer, Assistant Field Office Director Hagan, threatened Mr. Argueta Anariba, "the only way you leave this facility is if you die here."

36. During this time, ICE officers had direct knowledge of Mr. Argueta Anariba's hunger strike and spoke with Mr. Argueta Anariba at Adams County on multiple occasions.

37. Instead of providing Mr. Argueta Anariba with the requisite medical care, Defendants subjected him to solitary confinement in an attempt to silence him.

38. The PBNDS state that "No detainee shall be harassed, disciplined, punished, or otherwise retaliated against for filing a complaint or grievance." PBNDS, 6.2(II)(8). "Actions are considered retaliatory if they are in response to an informal or formal grievance that has been filed and the action has an adverse effect on the resident's life in the facility." *Id.* at 6.2(V)(G).

39. Under PBNDS Standard 4.2, Hunger Strikes,[12] detained individuals participating in hunger strikes may be "isolated for close supervision," and in the event of such isolation, "medical personnel shall monitor the detainee in a single-occupancy observation room, when medically advisable and taking into consideration the detainee's mental health needs." "Medical personnel shall document the reasons for placing a detainee in a single occupancy observation room. This decision shall be reviewed every 72 hours." In addition, "the ICE/ERO Field Office Director shall be immediately notified when a detainee is on a hunger strike."

40. ICE's use of solitary confinement in response to Plaintiff's participation in a hunger strike was punitive in nature. ICE administers several types of solitary confinement including (1)

---

[12] PBNDS Standard 4.2, Hunger Strikes, https://www.ice.gov/doclib/detention-standards/2011/4-2.pdf.

disciplinary segregation[13] and (2) administrative segregation.[14] The Special Management Unit Policy (the "SMU Policy"), issued as part of the PBNDS, governs ICE's use of solitary confinement. The SMU Policy prohibits the use of punitive solitary confinement except where a detained person has been found at a disciplinary hearing to have committed a serious violation of a facility rule.[15]

41.     Plaintiff did not violate any facility rules and was not involved in any disciplinary hearing. ICE did not conduct a disciplinary hearing or obtain an order of a facility disciplinary hearing authorizing Plaintiff' placement in solitary confinement, in contravention of the SMU Policy. Defendants' placement of Plaintiff in punitive solitary confinement is thus retaliatory and in violation of the PBNDS.

---

[13] *See* ICE Directive No. 11065.1, Review of the Use of Segregation for ICE Detainees (2013), 3.2, https://www.ice.gov/doclib/detention-reform/pdf/segregation_directive.pdf ("Disciplinary segregation is a punitive form of separation from the general population for disciplinary reasons. Disciplinary segregation is authorized only pursuant to the order of a facility disciplinary panel, following a hearing in which the detainee is determined to have committed serious misconduct in violation of a facility rule, and only consistent with the Disciplinary Severity Scale from the applicable ICE detention standards, and only when alternative dispositions would inadequately regulate detainee behavior.").

[14] *See* ICE Directive No. 11065.1, Review of the Use of Segregation for ICE Detainees (2013), 3.1, https://www.ice.gov/doclib/detention-reform/pdf/segregation_directive.pdf ("Administrative segregation is a non-punitive form of separation from the general population for administrative reasons. Administrative segregation is authorized only as necessary to ensure the safety of the detainee, facility staff, and other detainees; the protection of property; or the security or good order of the facility, and therefore should be for the briefest term and under the least restrictive conditions practicable, consistent with the rationale for placement. Generally, detainees in administrative segregation shall receive the same privileges as detainees housed in the general population, consistent with safety and security concerns.").

[15] *See* U.S. Immigration and Customs Enforcement, 2.12 Special Management Units, Performance-Based National Detention Standards, 177 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf

42.     On December 11, 2020, Mr. Argueta Anariba was transferred to Joe Corley Detention Center ("Joe Corley") in Conroe, Texas. He was then transferred from Joe Corley to Pine Prairie on December 16, 2020.

**The Defendants Physically Assault Plaintiff At Pine Prairie
and Retaliate Against Plaintiff By Punishing Him with Solitary Confinement**

43.     Mr. Argueta Anariba was detained at Pine Prairie from December 16, 2020, through April 6, 2022. During this time, he continued to experience severe mistreatment in detention, including ongoing medical neglect.

44.     From January 2021 through August 2021, Mr. Argueta Anariba participated in several prolonged hunger strikes at Pine Prairie in order to protest his mistreatment and medical neglect.

45.     He was frequently held in solitary confinement as punishment for hunger striking. In August 2021, Mr. Argueta Anariba participated in a 34 day hunger strike following officers' refusal to provide him with medication that he was prescribed after an operation on his nasal passages. While in solitary confinement, he was subjected to verbal abuse, threats, and harassment by facility officials.

46.     Mr. Argueta Anariba was frequently subjected to unwarranted and invasive body searches and harassment by facility officials in retaliation for his self-advocacy. Prior to March 17, 2022, he was subjected to these targeted searched three to seven times per day for three continuous weeks.

47.     On March 17, 2022 at approximately 8:00 am, four officers entered Mr. Argueta Anariba's cell in dorm "Bravo Alpha" to search his person. He identified these facility officials as Officers Daley, Freeman, Deseo, and Hall. Mr. Argueta Anariba was lying in bed in just his undergarments and told the officers that he needed a moment to dress. The officers permitted him

to put on his shirt, but not his pants or his full uniform. They then patted him down inside the cell and told him to exit the cell.

48.     Once outside the cell, in the hallway, one officer told Mr. Argueta Anariba that he was going to pat him down again. Mr. Argueta Anariba asked why and pointed out that the officers had just searched him in his cell. He said "I'm here in my boxers, what would I be hiding?" The officers then took him to the game room while they searched his cell for approximately 20 minutes.

49.     They then walked Mr. Argueta Anariba back, past his cell, and informed him that he was being taken to a solitary confinement cell. Mr. Argueta Anariba did not resist and asked the officers if someone could pack up and secure his belongings in his cell. The officers reacted to his request with anger. One guard, Officer Daley, expressed a desire to handcuff Mr. Argueta Anariba.

50.     At that point the Major came and asked Mr. Argueta Anariba what happened. Mr. Argueta Anariba replied in English that he just wanted to make sure his property was secured before being taken to solitary confinement. The Major told Mr. Argueta Anariba that she would make sure his property was secured and so Mr. Argueta Anariba put his hands behind his back and allowed the officers to put him in handcuffs.

51.     After Mr. Argueta Anariba put his hands behind his back and the officers handcuffed him, one of the officers grabbed his right arm roughly and started to violently drag Mr. Argueta Anariba to solitary confinement by his handcuffed arm. This sudden onset of aggressive, violent use of force was unwarranted and unprovoked.

52.     While being dragged by his handcuffed arm, Mr. Argueta Anariba heard an officer say "take him down," and he felt an officer from behind grab his handcuffed wrists and push them up backwards using significant force. This motion forced Mr. Argueta Anariba's head down and he was pushed face-first to the floor. The officers violently slammed his forehead on the floor and

forcefully twisted his handcuffed arms backwards. Mr. Argueta Anariba felt excruciating pain radiating from his right shoulder to his arm. This incident occurred in the "Bravo Alpha" main hallway.

53.     The officers were armed with tasers and Mr. Argueta Anariba feared that he would be tased.

54.     The officers then picked Mr. Argueta Anariba up off the floor by his arms and legs and made him walk down the hallway with his cuffed hands in the air behind him and his head down. This experience was humiliating and degrading and caused Mr. Argueta Anariba significant psychological harm and emotional turmoil.

55.     After this incident, in addition to a severely injured shoulder, he was left with a bruised clavicle and cuts and bruises to his wrists and hands from the handcuffs.

56.     The officers then took Mr. Argueta Anariba to the medical unit. Mr. Argueta Anariba could not fully explain to the medical staff what happened to him because he was deprived of his right to confidentiality. The officers who harmed him were standing behind him for the duration of the medical examination. The doctor told Mr. Argueta Anariba that he had injured a ligament in his right shoulder.

57.     After the medical examination, he was taken to a solitary confinement cell where he was held for approximately 16 days. He was denied access to recreational time, including access to the phone and television. For the majority of this time period, he was held in the cell for 24 hours a day. During this time, officers refused to allow Mr. Argueta Anariba to shower unless he was shackled with his hands behind his back. Because of his severely injured shoulder, Mr. Argueta Anariba could not hold his arms behind his back without experiencing excruciating pain. As a result, he was denied access to a shower for a period of ten days.

58.     While in solitary confinement, Mr. Argueta Anariba was subjected to frequent verbal abuse and harassment by facility officials. On March 21, 2022, at approximately 6:50 am, a Pine Prairie official named Officer Guidry and another officer were distributing breakfast meals to individuals in solitary confinement. The officers mistakenly gave Mr. Argueta Anariba's allergy diet meal to a different detained individual. That other individual had already started eating Mr. Argueta Anariba's meal and so Officer Guidry returned to Mr. Argueta Anariba's cell and told him to eat the regular meal. When Mr. Argueta Anariba asked Officer Guidry to contact the kitchen to replace his allergy meal, Officer Guidry began to scream repeatedly at Mr. Argueta Anariba, "Fuck you motherfucker bitch." Mr. Argueta Anariba asked to speak with Lieutenant Gahn and Officer Guidry responded "Shut up motherfucker bitch. I'm not going to call nobody and I'm going to fuck with you all day long." Officer Guidry then left and returned 30 minutes later.

59.     Mr. Argueta Anariba again asked to speak with Lieutenant Gahn. When Lieutenant Gahn arrived, she asked Mr. Argueta Anariba if he would like the meal or if he refused it to which he explained that he was provided with a meal that he cannot eat because of his allergy. Lieutenant Gahn then spoke with Officer Guidry privately and returned to Mr. Argueta Anariba's cell. After this incident, facility officials frequently brought Mr. Argueta Anariba the wrong meal – resulting in his inability to eat sufficient meals while in solitary confinement.

60.     On March 23, 2022, Mr. Argueta Anariba was taken back to the medical unit because he was experiencing worsening, severe pain in his right arm and shoulder. The facility doctor told him that the ligament in his right shoulder was likely torn and ordered an MRI to confirm. Mr. Argueta Anariba received an MRI at Acadian Medical Center in Eunice, Louisiana on March 31, 2022. He was informed that the damage to the tendon in his right shoulder would take 6-12 weeks to heal completely.

61. This assault was unlawful and unjustified, as recognized by ICE's own policies on the use of force. ICE's Use of Force Policy ("Use of Force Policy"), issued as part of the PBNDS, states that the immediate use of force is only permitted when "a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility."[16] Mr. Argueta Anariba had not displayed any behavior that constituted a threat to himself or the officers. He was in full compliance with the directions communicated by the officers. The officers' physical assault was unprovoked and against the Use of Force Policy.

62. Further, the Use of Force Policy explicitly prohibits the use of force to punish a detained person.[17] The officers' attack on Plaintiff was intended to punish Plaintiff for his self-advocacy and participation in multiple hunger strikes.

63. Mr. Argueta Anariba continues to suffer from debilitating pain and weakness to his right arm and shoulder. As a result of this assault and injury, he has acute nerve damage in his shoulder that prevents him from using his right arm.

64. This injury has prevented Mr. Argueta Anariba from working and supporting himself and his family financially. Prior to his detention by ICE, he was working as a foreman, a carpenter, and construction worker. Mr. Argueta Anariba is right-handed and due to the injury, has lost the feeling in the fingers in his right hand and is unable to hold or grasp anything using that hand. He is also unable to lift or carry heavy objects.

65. He also requires ongoing medical treatment and physical therapy to address the nerve damage and ongoing pain in his arm and shoulder. Due to his physical injury and resulting

---

[16] U.S. Immigration and Customs Enforcement, 2.15 Use of Force and Restraints, Performance-Based National Detention Standards, 206 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[17] *Id.* at 202.

disability, Mr. Argueta Anariba is unable to afford health insurance and is experiencing significant difficultly accessing medical care to address his emergent needs.

66.     In December 2018, Mr. Argueta Anariba was diagnosed with Posttraumatic Stress Disorder (PTSD) and Chronic Pain Due to Trauma. While detained, his PTSD symptoms included flashbacks, typically accompanied by intense physical reactions; heart palpitations; sweating; trembling; shortness of breath; dissociative episodes; memory issues; disorientation; flashbacks triggered by loud noises; and difficulty sleeping. ICE's abuse of Plaintiff created a highly stressful environment that severely exacerbated his PTSD symptoms.

67.     Following the grant of his habeas corpus petition, Mr. Argueta Anariba was granted bond by an immigration judge and was released from ICE custody on April 6, 2022. He continues to experience emotional and psychological distress from this mistreatment.

## CLAIMS FOR RELIEF

## COUNT I: NEGLIGENCE (FTCA)

68.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

69.     Courts analyze FTCA claims under "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

70.     In Louisiana, negligence occurs when: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the requisite duty of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injury; (4) the risk, and harm caused, was within the scope of protection afforded by the duty breached; and (5) damages. *Fowler v. Roberts*, 556 So. 2d 1, 4 (La. 1989), *abrogated on other grounds by Gregor v. Argenot Great Cent. Ins. Co.*, 851 So. 2d 959 (La. 2003). In Mississippi, negligence occurs when: the defendant owed plaintiff a duty of

care and the defendant's substandard cause was the proximate cause of plaintiff's injury. *Sanderson Farms, Inc. v. McCullough*, 212 So. 3d 69, 76 (Miss. 2017).

71.     The federal employees, officials, and agents referenced above had a duty to Plaintiff to act with ordinary care and prudence so as not to cause harm or injury to Mr. Argueta Anariba.

72.     Additionally, the federal employees, officials, and agents referenced above owed Plaintiff a heightened duty of care because at all times relevant to this complaint, they maintained custody over Plaintiff.  ICE's PBNDS provides binding directives on the use of force and solitary confinement in all facilities housing ICE detainees. By providing uniform standards of care to all ICE detainees, the PBNDS aims to protect detainees. Plaintiff thus falls within the class of persons the PBNDS aims to protect.

73.     Defendants engaged in the negligent and careless acts and/or omissions described in detail above, and including, but not limited to:

   a.     Failing to care for Plaintiff in accordance with the PBNDS, the Force Policy, and the SMU Policy, referenced above;

   b.     Failing to ensure that the officers in the facility followed the Force Policy in their interactions with Mr. Argueta Anariba, including excessive use of force (Louisiana only); and

   c.     Placing and maintaining Plaintiff's placement in punitive solitary confinement, in violation of the SMU Policy: specifically, failing to review his placement every 72 hours, and then failing to order GEO officers to remove the punitive conditions from Mr. Argueta Anariba's segregation, when ICE officers visited Mr. Argueta Anariba and were aware of the punitive nature of his confinement.

74.     As a direct and proximate result of Defendants' agents' negligent conduct, Plaintiff suffered, and continues to suffer, substantial injuries, including but not limited to pain, physical injury, and emotional distress.

75.     Under the Federal Tort Claims Act, the United States is liable to Mr. Argueta Anariba for negligence.

## COUNT II: NEGLIGENT SUPERVISION (FTCA)

76.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

77.     Under Louisiana law, an employer may be held liable for the torts of their employee based on the employer's negligent supervision, and that analysis follows the same five-part analysis used in negligence claims: duty, breach, causation, scope of liability or protection, and damages. *Gomez v. Galman*, 18 F.4th 769, 780 (5th Cir. 2021) (citing *Kelley v. Dyson*, 10 So. 3d 283, 287 (La. Ct. App. 2009)). Under Mississippi law, negligent supervision occurs when the defendant is negligent by breaching a duty of care owed to the plaintiff that is a proximate cause of the injury. *Simpson Cnty. Sch. Dist. v. Wigley as Next Friend of J.L.H.*, 356 So. 3d 147, 154 (Miss. Ct. App. 2022).

78.     Plaintiff suffered damages from the foreseeable misconduct of federal employees and agents supervised by the defendant. The government's employees in supervisory roles have a duty to properly supervise detention officers and to oversee their treatment of noncitizens in their custody.

79.     Federal employees, officials, and agents owed a duty of care to Mr. Argueta Anariba while he remained in their custody. These individuals breached their mandatory, non-discretionary duties to Plaintiff, including by failing to properly oversee facilities and staff. The blatant disregard

for ICE's own internal policies and regulations, described above and demonstrated by Defendants' agents' behavior, shows that ICE staff were negligent in their non-discretionary duties to supervise individual officers. The government knew or should have known of these behaviors and nevertheless failed to adequately supervise the individual officers. Instances of this negligent supervision include:

    a.    Failing to ensure that supervised employees cared for Mr. Argueta Anariba in accordance with the PBNDS, the Force Policy, and SMU Policy, referenced above, when ICE officers regularly visited the facilities and saw Plaintiff;

    b.    Failing to supervise detention officers during Mr. Argueta Anariba's hunger strikes to ensure that his detention complied with the PBNDS and other relevant standards and laws, including that his isolation was not punitive, when the ICE/ERO Field Office Director must, pursuant to PBNDS Standard 4.2, be notified immediately when a detainee is on hunger strike, and the decision to place a hunger striking detainee in an observation room must be reviewed every 72 hours, and when ICE officers were aware of the punitive nature of Mr. Argueta Anariba's confinement;

    c.    Failing to supervise detention officers to ensure they exercise adequate care in restraining Plaintiff, including refraining from excessive use of force as prohibited by the Use of Force Policy, particularly when Mr. Argueta Anariba had previously been in full compliance during the excessive and harassing pat downs prior to the assault (Louisiana only).

80.     The government's negligent supervision proximately caused the unlawful conduct described herein.

81.     As a proximate result of the negligent supervision, Plaintiff suffered, and continues to suffer, severe pain, physical injury, and emotional distress.

82.     Under the Federal Tort Claims Act, the United States is liable to Mr. Argueta Anariba for negligent supervision.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (FTCA)

83.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

84.     Under Louisiana law, intentional infliction of emotional distress occurs where the defendant intentionally or recklessly engages in extreme and outrageous conduct that causes the plaintiff severe emotional distress. *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991). Under Mississippi law, intentional infliction of emotional distress occurs where the defendant willfully or wantonly engages in outrageous or revolting conduct that is directed at the plaintiff and causes the plaintiff severe emotional distress. *J.R. ex rel. R.R. v. Malley*, 62 So. 3d 902, 906–07 (Miss. 2011).

85.     The federal employees and officers referenced above intentionally, recklessly, wantonly, or willfully engaged in extreme and outrageous conduct that inflicted severe emotional distress on Plaintiff, including:

      a.     Unwarranted and invasive body searches and harassment, as often as three to seven times per day for a period of at least three weeks, during which ICE officers were at the facility and interacted with Mr. Argueta Anariba, leading up to his assault while following all directions and handcuffed;

b.    Punitive solitary confinement, including a 34-day period in solitary at Adams, and a 16 day long period at Pine Prairie, during which he was held in the cell for 24 hours a day and was denied access to recreational time and recreational material, had his water shut off, was denied access to showers, or had to go to the shower while handcuffed;

c.    Was assaulted while following all directions and handcuffed (Louisiana only).

86.    Plaintiff suffered, and continues to suffer, severe emotional distress and mental anguish as a result of this conduct.

87.    Under the Federal Tort Claims Act, the United States is liable to Mr. Argueta Anariba for intentional infliction of emotional distress.

**COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (FTCA)**

88.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

89.    Under Louisiana law, an individual is liable for negligent infliction of emotional distress when the plaintiff has proven, in addition to the risk-duty analysis of a regular negligence action, that "the special likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Spencer v. Valero Ref. Meraux, L.L.C.*, 356 So. 3d 936, 950 (La. 2023) (quoting *Moresi v. State Through Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1096 (La. 1990)). The plaintiff does *not* need to prove (1) that there is a special duty the defendant owed plaintiff, (2) that defendant's conduct was outrageous, (3) that the emotional distress suffered was reasonably foreseeable, and (4) that the emotional distress is severe and debilitating. *Id.* Under Mississippi law, negligent infliction of emotional distress occurs

when an individual breached a duty of care, and plaintiff's emotional distress was a reasonably foreseeable result of defendant's substandard conduct. *Morgan v. Greenwaldt*, 786 So. 2d 1037, 1044 (Miss. 2001).

90. The federal employees, officials, and agents referenced above had a duty to Plaintiff to act with ordinary care and prudence so as not to cause harm or injury to Plaintiff because at all times relevant to this complaint, they maintained custody over Plaintiff. ICE's PBNDS provides binding directives on the use of force and solitary confinement in all facilities housing ICE detainees. By providing uniform standards of care to all ICE detainees, the PBNDS aims to protect detainees. Plaintiff thus falls within the class of persons the PBNDS aims to protect.

91. Defendants engaged in the negligent and careless acts and/or omissions described in detail above, and including, but not limited to:

    a.    Failing to care for Plaintiff in accordance with the PBNDS, the Force Policy, and the SMU Policy, referenced above;

    b.    Failing to exercise adequate care in restraining Plaintiff, including excessive use of force (Louisiana only), in violation of the Force Policy; and

    c.    Placing and maintaining Plaintiff's placement in punitive solitary confinement, in violation of the SMU Policy: specifically, failing to review his placement every 72 hours, and then failing to order GEO officers to remove the punitive conditions from Mr. Argueta Anariba's segregation, when ICE officers visited Mr. Argueta Anariba and were aware of the punitive nature of his confinement..

92. As a direct and proximate result of Defendants' agents' negligent conduct, Plaintiff suffered, and continues to suffer, severe mental distress, including but not limited to exacerbated

PTSD, with symptoms of flashbacks, typically accompanied by intense physical reactions; heart palpitations; sweating; trembling; shortness of breath; dissociative episodes; memory issues; disorientation; flashbacks triggered by loud noises; and difficulty sleeping. The injuries were a foreseeable result of defendants' conduct.

93.     Under the Federal Tort Claims Act, the United States is liable to Mr. Argueta Anariba for negligent infliction of emotional distress.

## COUNT V: ABUSE OF PROCESS

94.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

95.     Under D.C. law, where ICE headquarters are located and decisions made, abuse of process occurs when the defendant (1) has an ulterior motive, and (2) utilizes a process in a way contrary to the purpose for which it was intended. *Thorp v. D.C.*, 319 F. Supp. 3d, 22 (D.D.C. 2018). Under Louisiana law, where the local ICE Field Office is located and decisions are made, abuse of process occurs when a defendant has "(1) an ulterior purpose;" and (2) engages in "a willful act in the use of process that is not in the regular conduct of the proceeding." *Directv, Inc. v. Atwood*, No. CIV.A. 03-1457, 2003 WL 22765354, at *2 (E.D. La. Nov. 19, 2003).

96.     Under ICE's own policies, the federal employees, officials, and agents had to follow certain protocols in placing Mr. Argueta Anariba in segregation for prolonged periods of time. But the federal employees, officials, and agents had an ulterior motive in utilizing punitive solitary confinement, namely retaliating against Mr. Argueta Anariba for his hunger striking and self-advocacy, including filing grievances and complaints. In retaliating against Mr. Argueta Anariba, the federal employees, officials, and agents abused the process that allows them to place hunger striking individuals in isolation for close supervision. The decision to place a hunger striking

individual in non-punitive segregation must be reviewed every 72 hours, and the ICE/ERO Field Office Director must be notified of any ongoing hunger strike. Instead, Mr. Argueta Anariba was placed in punitive conditions, including, but not limited to, being held in the cell for 24 hours a day, losing access to recreational time and recreational material, having his water shut off, and he was denied access to showers, or had to go to the shower while handcuffed. In failing to conduct the review every 72 hours and then failing to order GEO officers to remove the punitive conditions from Mr. Argueta Anariba's segregation, ICE violated its own PBNDS processes.

97.     Plaintiff was injured by Defendants' misconduct, including but not limited to Defendants' agents use of weaponizing solitary confinement against Plaintiff. Plaintiff has suffered, and continues to suffer, mental and emotional distress, including, but not limited to exacerbated PTSD, with symptoms of flashbacks, typically accompanied by intense physical reactions; heart palpitations; sweating; trembling; shortness of breath; dissociative episodes; memory issues; disorientation; flashbacks triggered by loud noises; and difficulty sleeping..

98.     Under the Federal Tort Claims Act, the United States is liable to Mr. Argueta Anariba for abuse of process.

### COUNT VI: BATTERY (STATE LAW CLAIM)

99.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

100.    Under Louisiana tort law, a plaintiff can recover damages from any injury that is caused by the act of another. La. C.C. Art. 2315(A).

101.    Battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact[.] *Landry v. Bellanger*, 851 So. 2d 943, 949 (La. 2003) (citation omitted). The defendant need only to intend to make offensive contact without

plaintiff's consent; the defendant need not have acted maliciously, or intended to cause actual damage. *Id.*

102.     Damages that occur as a result of a "crime of violence" as defined in Louisiana state law are subject to a two-year statute of limitations. La. C.C. Art. 3493.10. Second degree battery is a crime of violence. La. R.S. § 14:2.B(6). Second degree battery is where the offender intentionally inflicts serious bodily injury. *Id.* § 14:34.1.A.

103.     The Individual GEO Defendants intentionally physically attacked Mr. Argueta Anariba without any legal justification and without Mr. Argueta Anariba's consent when they grabbed his handcuffed wrists and pushed his hands up forcefully, slammed his forehead into the ground, and forcefully twisting his handcuffed arms backwards. Mr. Argueta Anariba had been in full compliance with the officers' directions before the use of force. The Individual GEO Defendants intended to inflict serious injury, as indicated when an officer said "take him down," despite Mr. Argueta Anariba complying with all instructions.

104.     As direct and proximate result of the Individual Officer Defendants' intentional harmful or offensive contact, Mr. Argueta Anariba suffered the injuries detailed above, including serious bodily injury including damage to his shoulder tendon, long-term acute nerve damage limiting the use of his arm and resulting in chronic pain, and long-lasting emotional distress, entitling him to compensatory and special damages, in amounts to be determined at trial.

## COUNT VII: ASSAULT (STATE LAW CLAIM)

105.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

106.     Under Louisiana tort law, a plaintiff can recover damages from any injury that is caused by the act of another. La. C.C. Art. 2315(A).

107.     Assault is the threat of harmful or offensive contact. *Pelitire v. Rinker*, 270 So. 3d 817, 833 (La. Ct. App. 2019) (citing *Lawson v. Straus*, 673 So. 2d 223, 226 (La. Ct. App. 1996); *see also Duncan v. Celestine*, No. CV 18-06143, 2020 WL 823113, at *5 (E.D. La. Jan. 16, 2020), *report and recommendation adopted*, No. CV 18-6143, 2020 WL 815462 (E.D. La. Feb. 19, 2020).

108.     Damages that occur as a result of a "crime of violence" as defined in Louisiana state law are subject to a two-year statute of limitations. La. C.C. Art. 3493.10. Aggravated assault is a crime of violence. La. R.S. § 14:2.B(7).   Aggravated assault is assault committed with a dangerous weapon. *Id.* § 14:37.A. A dangerous weapon is "any . . . instrumentality, which, in the manner used, is calculated or likely to produce . . . great bodily harm." *Id.* § 14:2.A(3). The defendant does not need any specific criminal intent to have committed aggravated assault, only general criminal intent. *State v. Lewis*, 61 So. 3d 78, 85 (La. Ct. App. 2011).

109.     The Individual GEO officers assaulted Mr. Argueta Anariba when they threatened harmful contact, namely, telling an officer to "take [Mr. Argueta Anariba] down" while he was handcuffed and compliant. Mr. Argueta Anariba was aware that the GEO officers escorting him had dangerous weapons on their bodies—tasers. Upon hearing the verbal command to take him down, Mr. Argueta Anariba felt the threat of harmful contact from the taser, a dangerous weapon.

110.     As a result of the Individual Officer Defendants' threat of harmful or offensive contact, Plaintiff suffered injuries, including among other things, substantial physical injuries including tendon damage, nerve damage, and chronic pain, as well as lasting emotional distress, entitling him to compensatory and special damages, in amounts to be determined at trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

1)     Award Plaintiff all available compensatory and special damages in an amount to be proven at trial;

2)     Award attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

3)     Grant such other relief as the Court deems just and equitable.

DATED: March 15, 2024

*Respectfully submitted,*

*/s/ Sarah E. Decker*
Sarah E. Decker (D.D.C. Bar #NY0566)
ROBERT F. KENNEDY HUMAN RIGHTS
1300 19th Street NW, Suite 750
Washington, DC 20036
Tel.: (646) 289-5593
E: decker@rfkhumanrights.org

Sarah T. Gillman (D.D.C. Bar #NY0316)
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine Street, 8th Floor, Suite 801
New York, New York 10005
Tel.: (646) 289-5593
E: gillman@rfkhumanrights.org

Elyssa N. Williams, Esq.*
THE BRONX DEFENDERS
360 E. 161st Street
Bronx, NY 10451
Tel.: (347) 842-1391
Fax: (347) 842-113
E.: elyssaw@bronxdefenders.org

Matthew S. Vogel*†
Yulie Landan*+
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD (NIPNLG)
1200 18th Street NW, Suite 700
Washington, DC 20036
Tel.: (504) 569-5650
E.: matt@nipnlg.org
Tel.: (213) 430-5521
E.: yulie@nipnlg.org

*Attorneys for Plaintiff*

29

*Pro hac vice* application forthcoming

† Not admitted in DC; working remotely from and admitted in Louisiana only.

+ Not admitted in DC; working remotely from New York and admitted in California only.